318-0739 in re Estate of Ronald Reeder, appellant-less, cross-appellee vs. People of the State of Illinois, Tommy Raul, attorney-general, appellee-less, cross-appellant. Thank you. Mr. Gasek, you may proceed. Thank you, Justice Holdredge. Ronald Reeder was a very unique man, but he did have two wills, one in 97 and one in 05, both of which I did. He was high-functioning autistic, as I learned later, but he was a totally able and competent client, though quite different because of the high-functioning autism. He had an electrical engineering degree from Bradley in 1960, was interviewed by NASA down in Huntsville, and had a heck of a mathematical mind. What I'm focusing on is, in both those wills, in 97-01, his own plain wording. He used the words in Section 4, his fees, referring to the executor, for those activities his executor will be compensated at his then-current hourly rate for services rendered as an attorney. That was generated by Ron's compulsive demand for me to serve as executor. You'll see, even in the second will, he took out the alternate executor because I don't think he or his family ever were enamored with banks. To take that role on, that's how he solved it, using his words, we just use a common multiplier. Having those unique characteristics and the extreme compulsiveness, I viewed the Rule 1.52 and Rule 1.8, Part 1.52, says, The Rule does not prohibit a lawyer from seeking to have the lawyer or a partner or associate of the lawyer named as executor of the client's estate or to another potentially lucrative fiduciary position. The American College of Trust and Estate Council says it in much the same words, but adds an emphasis for, as long as he is properly informed. Is that an issue, Mr. Dasik, at all in this appeal, as to whether you can serve in both capacities? Pardon? Is that an issue in this appeal, the question of whether you can serve in both capacities? No, with that rule, I think not. I was trying to lay the background to the plain and ordinary language that is the focus of that sentence. You served in both roles? Yes. We don't have an issue with that, do we? I think we're losing connectivity here, Mr. Dasik. Hello? Yes. The whole will should be, in my understanding, is viewed in context. In the context of his autism, that he disinherited family, that he had no one, that he was in the same house since he was age three, all that I stressed to show the unique situation and how compulsive he was to demand that I serve in both those roles. The reference to the will as a whole, he uses words, he excuses security on the executor's bond. He, in section two, sets out his way of disposing of some of the contents of his home, gives me full discretion, dispose of the remainder as I see fit, and then chooses independent administration, which also makes his words paramount. Well, the question isn't whether he put faith and trust in you to serve as executor or, and presumably as attorney probating the estate, aren't the issues which were brought to bear by one of these, what, 27 charities he gave money to? There were two different ways that that developed. Three charities represented by the same firm, Holland and Knight, sent out demand letters, which I later quickly found out were by paralegals holding themselves out as attorneys. We were already many months into the estate, and as we're closing the estate, and I prepare a final report and send out final auditing, final accounting letters to each of the 27, three balked and received notice on the final report and received a supplemental letter. One other one that denied taking the services of Holland and Knight was represented by in-house counsel and retained local counsel. It all appeared to be something that was not envisioned by independent administration to, at the last minute, their clients had noticed from the get-go, all 27 of them, no one contacted me other than make calls about when are we going to receive our check. And then these demand letters came, and nowhere in independent administration is a demand for a complete audit with discovery at the close of every independent administration. So I resisted those, and it appears that one of those, when they finally did put a licensed attorney on that issue, Stacey Bird, it appears that she contacted the Charitable Trust Bureau, and then all, I had three more receipts, all 26 of the 27 forwarded signed receipts in approval. The remaining one has a pending objection for the Multiple Sclerosis Society, I believe. So then what immediately followed was the AG's petition to intervene, and that's how this case proceeded. Then discovery ensued, and we had a full hearing before Judge Gorman on May 2nd of 2018. So the Attorney General and Multiple Sclerosis wanted to see where in these letters is detail, and really didn't envision much detail, and those letters are in the record, an April 7th letter. And then 23 charities responded with their approval letters, and then for the other remaining, I sent out an additional letter that broke down the Wells Fargo expenses, attorney's fees, to arrive at a $3,013,000 distribution cut in the percentages that Mr. Reeder designed. And what I am arguing is that the decedent's own words in their plain and ordinary meeting did not permit Judge Gorman to just ignore that language. And I fully testified why I had to do everything I had to do there, because quite frankly, the most glaring concern was his parents were both in their early 20s during the Depression. Ron had very compulsive behavior. The house was as if Ron never touched anything of his parents, other than leave both their Wilton mortuary packets on their bed in their master bedroom. So being autistic on that high-end scale, Ron did not offer much information. In 05, when he revisited his will, his compulsiveness was to add cerebral palsy as the 27th charity. That was fine. It created two different time periods for his examination, if any relatives or heirs did. And the house I described was almost an organized hoarding. Empty boxes were everywhere, and there was no telling, did these people have other financial records other than Ron's that he didn't address? They, from that Depression era, leave cash hidden in the house. So I wasn't going to let contractors go in there until I did that, and him naming me as executor allowed me to do that. And that wasn't something I could hire out until I scoured that house. And I did hire contractors for things I didn't do. There was tremendous water problems in the basement. I hired a guy to do the gutter. I hired a guy to caulk the entire east side of the house that abuts the foundation. I hired an electrician, so there was a security light out back. I hired an electrician. I hired somebody to come out upon the recommendation of the second realtor, who did nothing, to rip out the carpeting in the living room and dining room to expose some wood floors. I hired a locksmith early on because the house had a skeleton key. And finally, we did get, through the second realtor, an interest in the house, and it ultimately sold. But it was only after we were certain that there's nothing else other than what's in that Wells Fargo account that had his assets. With all the searching of the house, did you ever find anything? Any one item? No. In fact, I had to pay to drill the safety deposit box at Commerce Bank because he hid the key to the safety deposit box in one of the drawers in the dining room. You couldn't find anything else, but you had to dig through meticulously stuffed drawers, closets, not knowing where they might have hid things, because I was haunted by an old estate where the gentleman left a note in the Borax can under the sink, as I said in the brief. And Ron didn't have a favorite nephew to tell these little secrets to. And in that 50-gallon drum marked asbestos was powdered soap with thousands of dollars worth of cash and coin. That's what I feared with Ron and his parents. But no, Justice Carter, we did not find anything else. And I was happy about that, but it wasn't something that I felt deserved any criticism for being thorough and diligent to make sure. And how much time was spent doing that? Well, in the record are 13 pages of time records. 298 total hours were spent combined. Judge Gorman— That's almost 300 hours, right? Pardon? Almost 300 hours? Yes. But Judge Gorman broke them down into clusters. You can see cluster one is related to the funeral and burial. And I don't know who else could have done that. I wanted to give this man the same funeral that his parents had, invited caretakers to come to his funeral. Co-workers came, put in an obit, gave him an obituary, gave him a memorial during the service at Wilton's, and driven by simply a man that's totally all in with $3 million to 27 charities of his personal choosing. I wasn't going to just let him fall through the cracks or somebody give him some generic funeral. The second cluster that Judge Gorman dealt with struck some— The will gives a proper name and address and phone number, but after almost nine years, I had to individually verify each of those. So, Justice Carter, it's the dichotomy that Judge Gorman had in those three clusters tells you where the time was spent. Right. Thirteen pages of statements itemizes to varying degrees. They weren't meant to be a diary, I said in my brief. They were meant to accurately depict the amount of time spent on each event. Mr. Gacy, the red light is on, the timer, and your time is up. I apologize, Judge. I have one eye and I'm colorblind. Well, no, it's my duty to tell you, so. Okay. Okay, that's fine. Thank you. But you'll have time in reply. Okay. Thank you. Thank you. Mr. Siegel, you may respond. Good morning, Your Honors, and may it please the Court. Assistant Attorney General Evan Siegel, on behalf of the people of the state of Illinois, ex rel. Kwame Raoul. I want to start with grounding us in some legal and factual, numerical matters to give context to what the appeal is about, the La Crosse appeal. And there seems to be one key fact here that I think we need to keep in mind as we discuss everything, and that's that the executor never registered this charitable estate with our charitable trust division, which is a requirement of the Charitable Trust Act. You heard him say a moment ago that he prepared two different versions of the will. Had he followed that simple registration requirement and followed the steps that come into play under the Act, the Trust Act, the people's intervention may not have been necessary, and this case may never have arisen. So with that in mind, I want to talk a little bit about the different buckets of money. Well, could you clarify where the violation occurred in this what seemingly appears to be a single account estate with a testator's directions that certain percentages of that estate go to certain charitable causes, 501c3s? That's right. But it appears little, if anything, there are no other legatees. Is that correct? That's correct, Your Honor. 27 different charities. Right. But what does the Act require on this simple estate and distribution? So when there's an estate with charitable beneficiaries, the trustee or the executor, terms are interchangeable under the Act, must, upon the first distribution, register the estate with the Attorney General's office. That's where our role comes in as a monitor. We have oversight of hundreds, if not more, estates where the legatee has left his or her resources to charitable entities. Well, I understand that, but you're saying that your intervention and your action and supervision occurs upon the first distribution, which, correct me if I'm wrong, only occurred at the closing of the estate or prior to the request to close the estate. Is that correct? Not quite, Your Honor. I want to just put aside our intervention for a moment and focus on our role, our oversight role. When there's a distribution, and there was one here in the summer of 2015 when the executor paid himself three times a sum of $51,000 for things that we don't even know because they've never been documented and he's never explained, that, based on the record, appears to be the moment when registration would have been required. So distribution means, your interpretation means distribution of any monies outside of the administered estate. Is that correct? Regardless to whom those distributions are made? I think the Act allows for that broader reading. Okay, but is there any law that restricts it that says that? I'm not aware of any case law, Your Honor, on that point. Okay, because one other alternative interpretation is your jurisdiction, so to speak, might occur only when the distribution is made to the legatees. That's a fair point, Your Honor. Another interpretation is that the distribution is the absolute last point when registration would be made. And there's nothing holding back an experienced executor who's been doing this for decades, who knows that there are 27 charities at the receiving end, from telling the Attorney General's office that there's a charitable estate to ensure that everything is properly done. That didn't happen here. And the executor paid himself $170,300 on a net estate of $3 million. Of that amount, $119,300 were in attorney's fees. And from that portion, the circuit court ordered the executor to return $36,500, leaving $82,800 in the executor's hands. Now the $36,500 is the focus of the main appeal, the $82,000 is the cross appeal. And separately from that $82,000, there is also what I just, in that ledger, what I referred to, there's $51,000 of self-payment for something that he calls lifetime power of attorney fees, never documented and explained. So the final tab is this, in these two buckets, he's paid himself, I'm sorry, in this one bucket, we have the $133,800 that the executor paid to himself, $82,800 at $400 an hour, that's 207 hours of what remains, and the undocumented, unexplained $51,000. Okay, the $82,000 is attorney fees, is what the trial court came up with. Did the trial court make any finding that $400 an hour was reasonable and customary in the area for attorney fees? She did. And we're not challenging the rate of fees. The challenge that my colleagues in the trial court brought, and which the circuit court ordered, turning back to the $36,500, was his overcharges for a number of items. And this decision is reviewed for an abuse of discretion. The sections of the Illinois Probate Act at issue here are sections 27.1 and 27.2, which allow for reasonable fees. But as the circuit court found in great detail, the executor spent an inordinate amount of time on unnecessary tasks. Now we're talking about executor actions, duties, and we have a contract arguably in the will that that's at the $400, right? That's right. That's right. We're talking across the board about $400. And now I'm focused on extraneous charges that the circuit court did not abuse its discretion in reducing his overall take with. So turn to talking about the funeral. As you heard the executor say, Mr. Reeder wanted his funeral to be modeled on his parents' services. There was a template for that. The executor charged over $8,000 for more than 20 hours that he spent planning this funeral that had been done twice, apparently, by a funeral home. And given the excessive charges, the circuit court reduced the executor's bill in this just one area by $5,800, leaving him to claim $2,400. Then moving to a separate area, having mostly to do with the sale of the Reeder family home, the circuit court identified another $2,600 that the executor spent on areas deemed, and I'm quoting from the circuit court decision, not particularly complicated. And let's just bear in mind that he overbilled by $26,300. The entire house itself sold for about, I think, $200 more. I may have that number wrong, but around $30,000. So these are some of the tasks that the circuit court identified as unnecessary, mopping a leak, showing the house when there was a realtor or two realtors, cleaning, putting out recycling, caulking, and then driving to the treasurer's office. And that's something reminiscent of this court's decision in In re State of Miller, where the court found that there was excessive and unwarranted driving to another clerk type office. So in deciding the executor fees, the circuit court takes into account four main factors, the good faith and efficiency of the work, the work involved, the skill evidenced by the work and the size of the estate. And when work in these realms doesn't provide value to the estate, the circuit court is within its power to reduce fees, executor fees, attorney's fees, however they're prearranged and billed. And this court affirmed just such a decision in its decision in re State of Miller, when the circuit court cut fees by about a third because of a lack of complexity. There was just such a lack of complexity here. And the $36,500 reduction from the total of $119,300 that the executor billed is around a 30% reduction tracking Miller. What fees or which fees are we talking about here? Attorney's fees or executor fees? I don't think there's a legal distinction, Your Honor, because the executor is an attorney. And I'm talking at this point about the work that the executor billed at his attorney rate to do these unnecessary things. I think there is a difference. I think the activities of being an attorney for an estate are different than the activities of being an executor. Right. And he billed at the same rate, and he could have delegated these to a service or had the realtor do this work. He duplicated the realtor's work. I'm talking now about just a unique silo of $26,300 for non-legal work. In addition, the circuit court found that he overbilled for his attorney work, and that was around $4,400 that he had to refund because he spent too much time, the circuit court found, on routine matters like getting ready for a hearing and preparing probate papers. So there are different buckets of the reduction. There's the $5,800 for the funeral. There's $4,400 approximately for the attorney work. And then there's all this housework of $26,300, which takes us to a total of $36,500. And that's the amount that the circuit court, in her discretion, reduced his fees by. This kind of reduction is warranted even when an attorney has extensive experience in legal matters. I'm talking, by analogy, just to the $4,400 bucket here. Extensive experience in legal matters, as this court found in the matter of Dudek's estate. And sometimes a reduction of attorney's fees to nothing is warranted when the work billed does not benefit the estate, as this court held in In re Estate of Riordan. But there's no authority for this theory that the executor puts forth that somehow a testator's will overrides all of these protections that are built in under the Act. And due to the Attorney General's oversight role or the court's role in this process. An executor is a special role in terms of charitable entities. And here the executor did not fulfill his duties by overbilling and not documenting many of his activities. And so the circuit court was well within its discretion to order the $36,500 refund. And now I'm going to turn to the cross appeal with my remaining time. While the circuit court did not abuse its discretion in the $36,500 reduction, it inexplicably overlooked the additional $133,000 that the executor paid himself. And my focus is going to be on the unexplained $51,000. In the summer of 2015, about a year after Reeder passed away, the executor wrote himself three different checks $29,700 $20,625 and $218. We know that that last one was for a humidifier, but the first two of almost $50,000 have never been explained. Why, why a year after he passed away, why these amounts, we don't know. And the circuit court made no findings on this issue. She did not analyze the issue. And there's no there's no decision for this court to review that that in in and of itself can be an abuse of discretion, when a circuit court exercises, no discretion. And we just, she didn't focus on it. She didn't explain why it was permissible for the executor to pay himself these mysterious amounts he's never explained what they're for. So there are three real problems with as a legal matter with what happened with this $51,000 sum. First, as I mentioned, and I see my time is up. So I'll reserve for rebuttal. I have one question. Justice Holdridge, do you mind if I go forward with my question? No, please. Mr. Segal, could you discuss what standard of review you think applies because I believe Mr. Gassick is arguing de novo. Yes, that's right. We believe that abuse of discretion is the correct standard of review for the cross appeal and for the appeal in the main, because we are not we're not interpreting here, Your Honor, a statutory provision. And we're certainly not interpreting statutory provision in the cross appeal because the circuit court made no analysis. To be sure, just very briefly, when we're interpreting a will provision de novo review applies, but we're not in that situation here. We have a mysterious $51,000 unexplained payment that violates some basic tenets of being an executor and for the circuit court not to have addressed any of this is an abuse of discretion. Thank you. Can I ask, was that brought up again to the circuit court that the $51,000 wasn't addressed? Yes, Your Honor. Yes, Your Honor. We filed a motion for reconsideration that was summarily denied in a single sentence. And that specifically was mentioned. Yes, we had two issues and that was one of them. Very good. You'll have to be able to reply, Mr. Segal. Okay, Mr. Gasek. Gary Gasek again. That's sort of disingenuous. The supplemental exhibit because the trial court failed to put in the 18 exhibits and we did it by supplemental. At supplemental exhibit 62, exhibit 12 are the two billing statements for everything that Mr. Segal is talking about. And they are itemized to much the same extent as the 13 pages for acting as an attorney and an executor. This is clearly a red herring, Justice Carter, because there are other exhibits. It was dealt with in the trial. We testified about them. And in argument in the trial court, the trial court AG quoted was going to Section 28 of the of the independent administration provisions and trying to work her way down to 18-8 To say that those weren't properly set out as a claim. Well, when she when she cited 28-8 to Judge Gorman, I pointed out in my response, you left out seven words. And those seven words are Specific reference in the opening seven sentence of 28-8 the words of the testator And that 28-8 sets up another reason the words of the will are present a priority. Because all those automatic independent administration powers are subject to the words of the testator. Just as I explained in in section four, he used the clear words. I want this guy to be my executor. He's my attorney. I want him to also execute executor and to solve this problem. We'll pay it at the same rate, then currently he's charging as attorney. The rate isn't in dispute. The whole document has to be looked at With the discretion in the section two tangible personal property and dispose of the balance as he sees fit. The It's the overpowering intention of independent administration is not designed for a 11th hour on demand audit by two paralegals in Georgia and Texas demanding that they be given everything that they itemize It came down to a phone call with Stacey Bird that I testified to She acknowledged that, yeah, they're charging for those services. Well, they had a Chicago office. Why didn't they send somebody down because they're charging for there was much concern. A decent amount of concern in my brief about Being at that house. This year, the first murder and the city of Peoria was next door. In between the space between the next door man Joe young man 24 years old, Joanne. Joanne Ward Warr shot shot there. Because I clearly recognized it on WKTV there's Ron's house. So my concern was As I said, admitted old school. Nobody was safe in that house. Ron was robbed in that backyard because he's such a Meek affable person, the homeless man in the backyard said, Can I see your wallet and then took all the cash out of it, but that's just something that Ron wouldn't would not pick a fight over And nor did I want Anybody in that house alone. The other thing is The realtor contract which I cited to the trial court. Lifted all blame off the realtors, if anything happened. They didn't even get there to turn the heat on on some winter showings and there was no guarantee that they'd locked the door when they left. Plus, when they were multiple listing service at a flat rate of $2,500 I gave a very vivid example in my brief. Yeah. Judge Gorman's comment might be well taken. If the house was worth 600,000 and the realtor was going to generate 20 or 30,000 Commission, then I'd impose on Got nowhere imposing on them, especially the first realtor because multiple listing was the extent of her services. Second gentleman that I listed immediately upon the expiration of the first was had some ideas on what to do. And I hired a contractor to rip out that carpeting So there was concern the neighborhood was not Inducive to surely letting one person May I ask one last question about the 51,000 that the argument is that you forfeited that argument by not Well, I probably giving a proper citations Justice Carter. Quite the contrary. How I saw it is the system at the trial court was arguing that 28 eight controls, but she left out the words referencing the words of the testator. The words in the will The words in the will are independent administration and additional powers under the will Powers of paying paying claims in my discretion. So it's this case is so unique because of the individual involved. And the home involved. The neighborhood involved. And The fear for other assets. If, if I had the nephew to tell me that the map for the hidden cash and coin is in the borax can under the sink. I have far less concern if if any But again, nothing was found right Nothing was found But that's so strange in a house that he's been in since age three never touched a drawer or a bedroom of his parents, the extensive cabinets in the dining room. When we went into him never touched by him. And at that point, the dementia had rolled in sometime after 2010 when he came to my office unannounced saying Gary, I am starting to forget things. Yeah, I follow him down the elevator. Make sure he finds his car and things start The autism starts to be totally clouded over by the dementia to the point where Kathy and I, my wife are called at 730 at night and he's 18 miles south of Lewiston because he went to the motor vehicle division to try and get his license, which I had a police officer take from him. When he couldn't went after that event with him getting lost turning right and studying left on Sterling Avenue. So there's all kinds of things. It's like I was in the blind. In that house to know what if anything has happened with to depression age clients and my own client who Only his communication is one way he doesn't disclose things to you like the to the nephew with the note under under the sink. I'm sorry to interrupt. Please do. But your, your time is up. And I have a really quick question for you was, did you begin a guardianship proceeding once the dementia overtook the autism. No, the dementia. You'll see there is a provision for disabled adults. I had, I had a POA and it was his autism and his compulsion that resisted me showing him nursing homes. I knew the day would ultimately come. We had Daily home care, including a nurse at times for his iliostomy Then let me ask you a question. You're not expecting to be compensated for those fees. Are you for fees for Ron during his lifetime. I if an exhibit 12 and the supplemental Record. Are the two bills. Those were running entries for serving as power of attorney at a rate of $350 an hour. But that That clarifies my question. I, I activated that power of attorney when my wife said he's not addressing his checkbook in the same way. All right, you've answered my question. Thank you very much. Okay, thank you. Thank you, sir. Mr Siegel you respond reply, please. Thank you, Your Honor. The executor believed that he had a claim on readers estate in his power of attorney role as you just heard for charges before reader died, but he did not pay himself during readers lifetime when reader would see those charges and perhaps questioned him. He paid himself. A year later in two withdrawals in one week in the summer of 2015 and what he did not do is seek court approval to do so under Section 18 eight of the Act. And What that provision requires Outside of any will provision is when there's a potential for a conflict of interest when the executor is wearing two hats and is serving as power of attorney. Section 28 eight he says that section 28 Section 18 controls. And I don't know what seven words. The executor is talking about, but I'm looking at the language of section 28 dash eight he and it says But claims of the independent representative or his attorney are subject to section 18 eight and section, excuse me, 18 eight gives the circuit court, the opportunity and authority to appoint an independent a special independent administrator when they're self dealing. And for whatever reason, with all of his experience and his rate of pay. The executor did not invoke that and Is incorrect in our view about what the statute requires did not did not go to the circuit court did not get go to reader for permission to pay himself $51,000 and the circuit court has not addressed this issue. There's not, there's no decision on this. It's just, it's just a blank. Now, no reasonable person would reach that determination on these facts and that's the hallmark of an abuse of discretion. There and He never met his obligation to show why he was entitled to this payment that that time has long past These oversights by the executor and by the circuit court warrant reversal without without a remand for yet another opportunity to explain why these payments were warranted given the requirements of the of section 18 dash eight There are two other problems with the self payment of $51,000 I mentioned earlier, the failure to report to register this Charitable state with our office did not do that. And then just more generically, there's nothing in the probate act that allows for Payments for power of attorney for things that happened before death. Yes, the executor can settle claims, but that's when again section 18 eight kicks in to avoid this inherent conflict of interest so We stand on our brief on the separate $82,500 that the executor has been enabled to retain for his attorneys fees and his Fees for spending a lot of time in what you just heard is a dangerous location. And we seek, but we do seek reversal and remand for further consideration by the circuit court of that remaining $82,500 Back to the 50,000 Which presumably part or all of it is our attorney. Correct. Savings. Okay, right. Okay. Is your even though this were an independently administered the state. Are you claiming or saying that that should have been formalized into a claim presented within the claims period after the state is open. Yes, he was required Let me finish that in that therefore, since it was not formalized into a claim within that timeframe that claim should not have been addressed by the executor. Is that correct. It was handled inappropriately. It should have been formalized as a claim presented to the circuit court and and of course is independent administration ended Why should have been presented to the circuit court under independent administration. Because testators wishes do not override protections that are in the probate act. If that were the case. Nothing about testators wishes if this were indeed identified as duties under a power of attorney that were performed. Is it not the case that it should have been formalized into a claim and under independent administration, the executor independent executor and pay the claim out of the estate. Now, This was never formalized as a claim, as I understand it. That's correct. It's just correct. It should not that be the end of the analysis. It should have been formalized into a claim. It wasn't. And once it was formalized into a claim we have this inherent conflict of interest and it should have been up to the circuit court. When was it When, how could it been formalized into a claim by the circuit court. It should have gone to the circuit court with the claim and ask permission to pay himself. Okay, so what you're saying is, if it were a formalized if it were a claim. Okay, then it should have under that provision because of the dual character of executive attorney right or executive power of attorney. Correct. That should have sought even under independent administration court approval. Is that correct, yes. Yes, that's, that's how you read section 28 dash at and section 2818 together. Instead, he wrote himself three checks. And so your basic cross appeal is that that was in error by the trial court to even have a payment of those sums right That's correct, Your Honor. Okay. So your, your remedy. It's your position is is too late to make a claim down that the remedy is to pay back to 51,000 That's correct, Your Honor. And pay back Reimburse the estate for 50 51,000 Correct. May I reply. Trying to get cross appeals are problematic here. Just quickly, very quickly. Very quickly. Reference. In addition, what I said to Justice Carter and exhibit 12 of the supplemental exhibitor are those two bills, Mr reader at the time of those POA services. Is totally engulfed by his dementia and in the nurse Headington Oaks nursing home. I had nothing to show him. And as far as my powers under independent administration. I have the power to pay all bills, including those incurred to his service under a power of attorney could have been anybody Serving those POA services. I did I paid the bill. It came in after his death because other things were more urgent. And that's how that got done. And as far as 28 a The exact words that were argued in the trial court where they left. She left out the words, the powers granted in the will and she just cut those seven words out when she's arguing this way to get to this. Present a claim of your of your own to the circuit court totally ignoring the powers under the will and the priority established in the first sentence of 2888 because it does say the powers below that are inconsistent with the powers specifically stated in the will are ignored. Okay, very good. Thank you counsel both for your arguments in this matter this morning, it will be taken under advisement and a written disposition shall issue